UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DAVID CLAYTON,

      Plaintiff,

      v.                                CAUSE NO. 3:24-CV-922-JD

BALLARD, et al.,

      Defendants.

<u>OPINION AND ORDER</u>

David Clayton, a prisoner without a lawyer, is proceeding in this case (1) "against the Warden of Miami Correctional Facility in his official capacity for injunctive relief to provide constitutionally adequate mental health treatment for his suicidal and homicidal thoughts, as required by the Eighth Amendment;" and (2) "against Dr. Ballard and Dr. Verdon in their individual capacities for compensatory and punitive damages for deliberate indifference to David Clayton's mental health needs, in violation of the Eighth Amendment[.]" ECF 7 at 5. The warden filed a motion for summary judgment, which is now fully briefed. ECF 74, 81, 94. Dr. Ballard and Dr. Verdon also filed a motion for summary judgment, which is likewise fully briefed. ECF 86, 97, 101. Clayton then filed a renewed motion for a preliminary injunction. ECF 90. Both summary judgment motions are now fully briefed and ripe for ruling.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). "[I]nferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009).

Under the Eighth Amendment, inmates are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the

2

decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the

Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical
> treatment to prisoners, but rather they must provide medical treatment
> that reflects professional judgment, practice, or standards. There is not one
> proper way to practice medicine in a prison, but rather a range of
> acceptable courses based on prevailing standards in the field. A medical
> professional's treatment decisions will be accorded deference unless no
> minimally competent professional would have so responded under those
> circumstances.

*Id.* at 697-698. Negligence, incompetence, or even medical malpractice do not amount to

deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled

to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Where the

defendant has provided some level of care for a prisoner's medical condition, in order

to establish deliberate indifference the prisoner must show that "the defendants'

responses to [his condition] were so plainly inappropriate as to permit the inference that

the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546

F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the

appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini

v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

Section 1983 requires a plaintiff to show more than just a violation of a

constitutional right. To recover damages from a defendant, he must also prove that

defendant was personally involved in the violation. *See Wolf-Lillie v. Sonquist*, 699 F.2d

864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based upon personal

liability and predicated upon fault."). A defendant cannot be liable without "a showing of direct responsibility for the improper action[.]" *Id.* This is because there is no general *respondeat superior* liability under 42 U.S.C. § 1983. *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009). As this circuit has explained:

> The doctrine of *respondeat superior* cannot be used to hold a supervisor liable for conduct of a subordinate that violates a plaintiff's constitutional rights. Supervisory liability will be found, however, if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it. That is, to be liable for the conduct of subordinates, a supervisor must be personally involved in that conduct. Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable. The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference.

*Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (citations and internal quotation marks omitted).

### *The warden*

Clayton is proceeding against the warden for injunctive relief to provide constitutionally adequate mental health treatment for his suicidal and homicidal thoughts, as required by the Eighth Amendment.[1] The warden provides affidavits and Clayton's medical records, which show the following facts:

Throughout his incarceration at Miami Correctional Facility (MCF), Clayton has a long history of transferring between restrictive housing and general population due to

---

[1] In his complaint, Clayton requested that the court issue an injunction ordering he be transferred out of restrictive housing and into a "mental health unit." When screening the case, the court noted Clayton is entitled to constitutionally adequate medical care, but is not entitled to dictate how he receives that care. Therefore, the court concluded that if any injunctive relief is warranted, it "would be limited to requiring that Clayton be provided with constitutionally adequate medical care for his condition, as required by the Eighth Amendment." ECF 7 at 5.

conduct violations. ECF 20-1 at 2. Generally, an inmate with a "Serious Mental Illness" (SMI) classification cannot remain in restrictive housing for more than thirty consecutive days. *Id.* at 2-3; ECF 20-12 at 21-22. An inmate with an SMI classification who is unlikely to return to general population within thirty days will instead be considered for placement in a mental health unit. ECF 20-12 at 22. However, under IDOC's "Danger Exception," an inmate with an SMI classification can remain in restrictive housing for more than 30 consecutive days if he presents a safety and security risk. *Id.*; ECF 20-1 at 2-3. The "Danger Exception" is invoked only in "rare instances" where the inmate "presents a unique safety and security concern," in which case he may remain in restrictive housing for more than 30 consecutive days on the recommendation of the Unit Manager and with the approval of IDOC's Executive Director of Behavioral Health and medical staff. ECF 20-1 at 3. As discussed in further detail below, Clayton's medical providers initially determined he did not meet the SMI criteria, meaning he was allowed to be housed in restrictive housing for more than thirty consecutive days. Later, Clayton's medical providers determined he did meet the SMI criteria, but nevertheless determined he should remain in restrictive housing under the "Danger Exception."

At MCF, the following mental health services are available to patients: group therapy, individual therapy, medication management with the psychiatrist or psychiatric nurse practitioner, and Addiction Recovery Services. ECF 87-2 at 2. The mental health staff consists of a psychiatrist, 2 psychologists, and mental health professionals (MHPs) that provide day-to-day mental health services. *Id.* When inmates

are in restrictive housing, they are provided with scheduled mental health care depending on their level of mental illness. *Id.* That care consists of segregation rounds done regularly by mental health staff, individual therapy with a qualified MHP, and medication management with the psychiatrist if necessary. *Id.* Clayton's medical records show he engaged in every type of mental health service offered. *Id.*

Specifically, Clayton's medical records show the following: During Clayton's initial intake assessment on October 11, 2021, an MHP determined he did not meet the SMI criteria because he denied mental health concerns and any suicidal or homicidal thoughts. ECF 20-4 at 1-6. The MHP noted Clayton had cut himself in the past, placed him on a 90-day mental health stability watch, referred him to a psychiatrist, and assigned him a Mental Status Classification of "C," meaning he had a "Psychiatric disorder that causes some functional impairment and requires frequent psychiatric and/or psychological services." *Id.* The MHP placed Clayton on the mental health roster so he would continue to be monitored, determined he could be placed in general population, and informed him he could access mental health services by submitting a healthcare request if he needed to be seen before his next scheduled appointment. *Id.*

On February 23, 2022, Clayton received a mental status exam with a psychiatrist. ECF 20-9 at 20-22. The psychiatrist noted Clayton had prior prescriptions for Zyprexa and Cymbalta for depression which had been discontinued due to his noncompliance. *Id.* Clayton reported his symptoms had been resolved and denied any current mental health symptoms or concerns. *Id*. The psychiatrist concluded she did not observe any

6

symptoms of mental illness and changed Clayton's Mental Status Classification from "C" to "A," meaning he was free of mental illness. *Id.*

On June 6, 2022, Clayton received an update to his mental health "Action Plan" adding goals of "addiction recovery treatment" and to "decrease the likelihood of further Substance Abuse while incarcerated and upon release." ECF 20-6 at 14-15. On June 15, 2022, Clayton received a mental health status exam which noted that his mental health status was "unremarkable" and "patient does not present any mental health issues at this time." *Id.* at 16-17.

On June 16, 2022, Clayton underwent a behavioral health classification exam. ECF 20-9 at 18. His Mental Status Classification was changed to "F," which is for patients who are free of mental illness but have substance abuse issues that cause functional impairment. *Id.*

On August 31, 2022, Clayton had a mental status exam for addiction recovery and did not present any mental health issues. ECF 20-9 at 16-17. On September 6, 2022, Clayton had another mental status exam for addiction recovery, and again did not relay any mental health concerns. *Id.* at 11-12. An MHP noted he had been regularly attending group therapy and actively participating within groups and recovery activities. *Id.* The MHP concluded Clayton did not meet the SMI criteria at that time. *Id.* at 14.

On September 13, 2022, Clayton had an individual psychotherapy visit with an MHP. ECF 20-11 at 20-21. Clayton did not have any outward signs of mental illness, did

not express any mental health concerns, and denied having any suicidal ideation, plan, or intent. *Id.*

On October 17, 2022, Clayton was placed in restrictive housing and a goal was added to his action plan to "maintain [mental health] stability while in [restrictive housing]." ECF 20-6 at 12-13. An MHP concluded he did not meet the SMI criteria, and he was placed back on regular mental health monitoring. *Id.*; ECF 20-9 at 15.

On May 22, 2023, Clayton was found with a weapon in his cell and it was reported he had stabbed himself in the neck. ECF 20-3 at 44-53. Over the next two days, Clayton was regularly seen by mental health staff for suicide monitoring. ECF 20-11 at 40-54. Clayton denied self-harming but was nevertheless placed on suicide watch. *Id.* On May 24, 2023, Clayton spoke with an MHP, denied any suicidal thoughts or ideations, and stated, "I am not doing anything like that again." *Id.* at 47-48. He also expressed fear for his safety due to a "drug debt" he had in the prison. *Id.* The MHP concluded in relevant part that, "Pt is using suicide watch for secondary gains and does not have genuine/true thoughts of wanting to kill himself or any wants/desires to harm himself or die." *Id.* Clayton was evaluated for suicide risk by another MHP and reported he feared for his safety but did not have any suicidal ideations. ECF 20-9 at 24-25. On May 24, 2023, Clayton was released from suicide watch. ECF 20-6 at 24. An MHP again concluded Clayton did not meet the SMI criteria, but ordered that he continue to receive suicide observation by behavioral health staff and changed his level to "close observation." ECF 20-9 at 3.

8

On June 16, 2023, Clayton underwent a behavioral health status classification. ECF 20-9 at 5. His Mental Status Classification remained as "F," which is for patients who have a history of substance abuse. *Id*. On June 28, 2023, Clayton's Mental Status Classification was changed to "C," which is for patients with a "psychiatric disorder that causes some functional impairment and requires psychiatric and/or psychological services to support an acute need or recent mental health crisis such as situational social stressors." *Id.* at 7-9

On July 5, 2023, Clayton received a "medication management" appointment with Dr. Aminata Cisse after he reported depressive and anxious symptoms. ECF 20-8 at 1-5. Dr. Cisse noted Clayton had a significant history of substance abuse for methamphetamine, and had last used methamphetamine in April 2023. *Id.* Clayton reported he had been experiencing depression and anxiety that had worsened over the past few months. *Id.* Dr. Cisse noted Clayton had stabbed himself in the neck about a month prior but that he currently denied any suicidal or homicidal ideations. *Id.* Dr. Cisse prescribed Clayton Prozac for his depression and anxiety. *Id.* at 5.

On August 1, 2023, Clayton received another medication management appointment with Dr. Cisse, where he reported a decrease in depression since starting Prozac. ECF 20-8 at 6-7. On October 4, 2023, Clayton received another medication management appointment and again reported being in a better mood. *Id.* at 11-13.

On November 8, 2023, Clayton underwent a Mental Status Exam with an MHP where he denied having any suicidal or homicidal ideations and overall was evaluated to have made good progress with respect to his mental health. ECF 20-9 at 34-36. On

9

January 4, 2024, an MHP concluded Clayton did not meet the SMI criteria. ECF 20-9 at 37.

On January 31, 2024, Clayton was evaluated for suicide risk after writing a letter to mental health staff expressing fearfulness regarding his safety. ECF 20-9 at 27-28. He received a Mental Status Exam with an MHP as well, where he did not raise any mental health concerns and only expressed concerns about his personal safety. *Id.* at 29-31. The MHP concluded Clayton's anxiety and depression were not significant at that time and ordered that he remain in restrictive housing and continue to receive regular mental health monitoring. *Id.* at 30.

On March 28, 2024, Clayton received his routine mental health evaluation with an MHP and did not express any mental health concerns. ECF 20-11 at 60-63. He also denied any suicidal ideation, plan, and intent, and the MHP concluded his mental status was stable. *Id.* On April 16, 2024, Clayton was again evaluated by an MHP and again denied having any mental health concerns and did not appear to be in significant mental distress. *Id.* at 85-90.

On April 23, 2024, Clayton had a medication management visit where he stated Prozac was no longer helping and was instead worsening his symptoms. ECF 20-8 at 37-43. It was ordered that his Prozac should be tapered off and discontinued and he should be started on Zoloft instead. *Id.* at 39.

On June 7, 2024, Clayton was evaluated by an MHP for a suicide risk due to a staff referral. ECF 20-9 at 47-51. He denied having any suicidal thoughts or elevated anger or hostility. *Id.*

10

On June 13, 2024, Clayton had a medication management visit where he reported he had stopped taking his Zoloft prescription due to side effects and worsening anxiety and depressive symptoms. ECF 20-8 at 26-29. His Zoloft prescription was stopped and he was prescribed Paxil as a replacement. *Id.*

On June 25, 2024, Clayton received a routine mental health evaluation. ECF 20-11 at 79-81. The MHP observed symptoms of depression and anxiety but not psychosis or thought disorder, and Clayton denied suicidal or homicidal ideation. *Id.* Clayton reported he did not have any other mental health concerns at that time, and the MHP concluded his mental health status was stable and he did not appear to be in any clinically significant distress. *Id.*

On July 9, 2024, Clayton had a medication management appointment and reported his anxiety was worse on both Paxil and Zoloft. ECF 20-8 at 30-36. His Paxil prescription was discontinued and he was started on Lamictal instead. *Id.*

On July 23, 2024, Clayton had a routine mental health evaluation with psychologist Dr. Rachel Ballard. ECF 20-8 at 82-84. Dr. Ballard did not observe any symptoms of depression, anxiety, psychosis, or thought disorder. *Id.* They discussed therapeutic skills to decrease depressive symptoms, including meditation and mindfulness. *Id.* Clayton discussed feelings of guilt over his behavior, expressed hope for the future and a desire to be a good father, and denied any additional mental health concerns. *Id.* Dr. Ballard concluded Clayton's mental status was stable at that time and his Mental Status Classification of "C" continued to be appropriate. *Id.*

On August 20, 2024, Clayton walked up to a guard and handed him a weapon stating he had planned to use it to stab someone but had "a change of heart." ECF 20-3 at 17. Clayton also reported eating two pieces of metal and medical was contacted. *Id.;* ECF 20-11 at 66-67. However, a follow-up radiology appointment found no evidence he swallowed metal and when the vent he allegedly swallowed this metal from was inspected, no fragments were missing from the vent. ECF 20-11 at 68-72.

On September 12, 2024, Clayton's chart was updated to note his Lamictal prescription was discontinued and he was started on Effexor and Prazosin for his mental health conditions. ECF 20-7 at 1-2.

On September 26, 2024, Clayton's chart was updated to note his prescription for Effexor had been discontinued due to side effects, he had started taking Celexa to treat depression and anxiety, and he was continued on Prazosin for nightmares. ECF 20-7 at 3.

On November 7, 2024, Clayton was seen by Dr. Ballard for a routine mental health evaluation. ECF 75-2 at 1. He reported concerns regarding feelings of anger, and Dr. Ballard noted this "thoughts of hurting others and impulsivity/aggression appear most problematic at this time." *Id.* Dr. Ballard did not observe any symptoms of anxiety, depression, psychosis, or thought disorder, and concluded Clayton's mental status appeared stable. *Id.* Clayton denied any further mental health problems but requested an appointment with psychiatry to discuss his medication, and Dr. Ballard noted his concerns would be shared with his provider and he would continue to be monitored by mental health staff. *Id.*

12

On December 4, 2024, Clayton received a Case Plan Credit Time (CPCT) visit regarding the goals that had been set for his mental health which included "comply with medication regimen" and "improve mental health condition." ECF 75-2 at 2. He was given a score of "acceptable" due to his engagement with mental health services, compliance with medications, and use of positive coping skills. *Id.*

On December 31, 2024, Clayton had a mental status exam with psychologist Dr. Lauren Rodgers. ECF 75-3 at 1-2. He reported he had "good and bad days," and spoke about his spirituality and that he denounced Satanism. *Id.* Dr. Rodgers did not observe any symptoms of anxiety, depression, psychosis, or thought disorder and concluded his mental status appeared stable and he did not appear to be in clinically significant distress. *Id.*  Dr. Rodgers updated Clayton's "Action Plan" to list three goals: (1) maintain his mental health stability while in restrictive housing; (2) depressive symptoms do not impair daily functioning; and (3) increase ability to express anger appropriately. ECF 20-6 at 18-20. The plan was to regularly monitor and assess him during weekly rounds and for him to attend both group and individual therapy. *Id.*

On January 28, 2025, Clayton had a medication management appointment where he complained his dosages of Celexa and Prazosin were too low. ECF 75-4 at 1-4. The MHP increased his dosages of both medications. *Id.*

On March 15, 2025, Clayton was seen and evaluated by an MHP. ECF 75-3 at 3-5. He denied suicidal ideation and homicidal ideation, but reported being "more irritable and on edge lately." *Id.* He reported that at times he had thoughts of harming others, but did not want to harm any specific person and had no plan to act upon it. *Id.* The

13

MHP went over distress tolerance skills with Clayton and referred him to a psychiatrist to review his medications. *Id.*

On April 12, 2025, Clayton was seen and evaluated by an MHP. ECF 75-3 at 6-8. He denied any suicidal or homicidal ideation but reported he was struggling with bad dreams about violence he had never committed. *Id.* He was also struggling with thoughts of hurting others and reported he would not leave his cell whenever he was upset with someone. *Id.* The MHP discussed the "triple column technique" with Clayton to examine whether his thoughts were rational or not, reviewed distraction techniques, and sent an email for him to be seen for a possible change in his medication. *Id.*

On April 15, 2025, Clayton had a medication management appointment with Dr. Andrew Kowalkowski and relayed that he was having urges to hurt people that were becoming hard to control. ECF 75-4 at 5-11. Dr. Kowalkowski noted Clayton was currently held in restrictive housing, went over coping strategies with him, started him on Depakote to help stabilize his mood, renewed his prescriptions for Celexa and Prazosin, confirmed he knew how to access crisis services, and directed him to immediately alert staff if any of his symptoms worsened. ECF 75-4 at 5-8.

On May 27, 2025, Clayton had another appointment with Dr. Ballard. ECF 75-3 at 9-12. He denied any suicidal or homicidal ideation, and reported his medication was helping with his nightmares but may be interfering with his ability to sleep. *Id.* Clayton stated he was proud of his efforts to stay out of trouble, and Dr. Ballard worked with him to reframe his negative thoughts and help him challenge "absolute" statements

about himself and others. *Id.* Dr. Ballard concluded Clayton's mental status was stable and he did not appear to be experiencing clinically significant distress. *Id.*

On July 1, 2025, Clayton was seen by an MHP for an individual psychotherapy visit. ECF 75-3 at 13-16. At that time, he was taking Celexa, Prazosin, and Depakote. *Id.* at 14. Clayton reported struggling with urges to hurt people but reported having coping skills. *Id.* He stated he felt the Depakote was not helping and was encouraged to talk to his doctor about it. *Id.* The MHP did not observe any symptoms of depression or anxiety, and reported that Clayton denied any suicidal ideations. *Id.*

On July 29, 2025, Clayton received an update to his individualized action plan. ECF 75-5 at 1-3. His goals were all continued, but it was determined he now met the SMI criteria because he was taking Depakote for his mood instability. *Id.* Because Clayton now met the SMI criteria, he was only allowed to remain in restrictive housing for thirty consecutive days unless it was determined he should remain past that date under the "Danger Exception." ECF 20-12 at 22. That same day, Clayton was given a Restrictive Housing Placement Review by Dr. Rodgers who identified Clayton's "mental health needs" as taking Depakote for mood instability and unspecified bipolar disorder. ECF 75-7 at 1. Dr. Rodgers noted he did not have any serious suicide attempts or serious self-injury incidents within the last 6 months, and had not demonstrated a pervasive pattern of dysfunctional or disruptive social interactions. *Id.* Dr. Rodgers also noted Clayton would be monitored under a 30-day provision and be presented with a consent to remain in restrictive housing at his next appointment. ECF 75-3 at 17-20.

On August 12, 2025, Clayton had a medication management appointment and reported he was having homicidal thoughts and urges. ECF 75-4 at 17-20. He agreed to switch from Depakote to Lamictal to help stabilize his mood. *Id.*

On August 19, 2025, Clayton was seen by Dr. Rodgers for a mental status exam. ECF 75-3 at 21-23. Clayton discussed that he had been prescribed Lamictal and was still waiting on it and that he was no longer being prescribed Depakote due to experiencing headaches. *Id.* Dr. Rodgers concluded Clayton's mental status was stable at that time. *Id.*

On September 2, 2025, Clayton was again seen by Dr. Rodgers and she noted he continued to meet the SMI criteria but was now staying in restrictive housing under IDOC's "Danger Exception," which allows inmates who meet the SMI criteria to remain in restrictive housing for more than thirty consecutive days. ECF 75-3 at 24-26. Clayton had started taking Lamictal, but stopped taking it because he believed it was causing blisters on his hands and feet. *Id.* He was compliant with his Prazosin and Celexa medications. *Id.* Dr. Rodgers did not observe any symptoms of anxiety or depression and noted Clayton denied any suicidal ideations. *Id.* Dr. Rodgers reviewed Clayton's emotion regulation coping skills with him and concluded his mental status was stable at that time. *Id.*

On September 4, 2025, Clayton received a CPCT visit regarding the goals he had set for his mental health including "engage meaningfully in therapeutic interventions," "comply with medication regimen," and "improve mental health condition." ECF 75-2 at 4. He was given a score of "acceptable" due to his medication compliance and consistent attendance to mental health and psychiatry appointments. *Id.*

On September 30, 2025, Clayton had a medication management appointment and was started on Latuda to help manage his mental health symptoms. ECF 75-4 at 29-32. His dosage of Prazosin was also increased. *Id.*

On October 9, 2025, Clayton was seen by an MHP for a mental status exam. ECF 75-3 at 27-29. He denied suicidal and homicidal ideation and the MHP concluded he did not appear to be at imminent risk for harm to self or others. *Id.* He reported that his mental health was "doing okay." *Id.* The MHP reviewed distress tolerance skills with Clayton and using his five senses to manage anxiety and depression that may arise. *Id.* The MHP also encouraged him to remain medication compliant and continue practicing his coping skills of reading, drawing, exercising, and calling his siblings for emotional support. *Id.* The MHP noted Clayton would remain in restrictive housing and continue being monitored by mental health staff. *Id.*

Between October 10, 2025, and November 5, 2025, Clayton was regularly seen by MHPs and did not report any mental health issues. ECF 95-1 at 23. On November 7, 2025, Clayton had a "90-day SMI review" to determine whether he should remain in restrictive housing under the "Danger Exception." ECF 94-2 at 1-2. In the review, Dr. Rodgers noted Clayton was scheduled to remain in restrictive housing until July 16, 2026, as a sanction for a staff assault. *Id.* It did not appear the staff assault was related to severe mental illness. *Id.* at 3. Dr. Rodgers reported that Clayton's mental status appeared stable during both individual therapy and mental health rounds and he was managing his activities of daily living appropriately. *Id.* at 1-2. She concluded there were no contraindications for his continued placement in restrictive housing, and

17

recommended he remain in restrictive housing and continue to be seen by MHPs. *Id.* at 1-2.

Between November 2025 and February 2026, Clayton continued to be regularly seen by MHPs and sometimes complained he was having homicidal thoughts, though at other times he reported no mental health concerns. ECF 95-1 at 19-23. He was scheduled for numerous mental health appointments, but many of these appointments were missed for various reasons, including custody issues, prison lockdowns, staff shortages, and Clayton's unavailability. ECF 95-2 at 14-27. On February 6, 2026, Clayton was seen by an MHP during rounds and did not report any mental health concerns. ECF 95-1 at 18-19. Clayton is currently scheduled to remain in restrictive housing until July 16, 2026. ECF 94-2 at 3. Because neither party disputes these facts, the court accepts them as undisputed.

The warden argues summary judgment is warranted in his favor because Clayton has received and continues to receive constitutionally adequate medical care for his mental health needs at MCF. ECF 77 at 7-12. Here, Clayton's medical records show he has been regularly seen and evaluated by mental health specialists at MCF, has regularly received both individual and group therapy, and his medication regimen has regularly been changed and altered in response to his symptoms and complaints. Clayton is scheduled to remain in restrictive housing under IDOC's "Danger Exception" until July 16, 2026, and his most recent "Action Plan" indicates he receives regular monitoring and weekly visits during rounds as well as being enrolled in both individual and group therapy. ECF 75-5 at 1-2. Because it is undisputed Clayton is

receiving regular treatment for his mental health needs, he can only survive summary judgment by showing the treatment he is receiving is "plainly inappropriate" or violates a standard of care. Clayton raises three arguments in this regard.

First, Clayton argues the medications he has received have not been effective at treating his homicidal thoughts. But the question is not whether the treatment Clayton has received has been effective, but whether it reflects the professional judgment, practice, or standards of his medical providers. *See Jackson*, 541 F.3d at 697 ("medical professionals are not required to provide 'proper' medical treatment to prisoners, but rather they must provide medical treatment that reflects 'professional judgment, practice, or standards'"); *Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021) (a plaintiff cannot establish an Eighth Amendment violation merely by alleging he "believes the treatment was ineffective or disagrees with the doctor's chosen course of treatment."). Clayton does not dispute his mental health providers have regularly prescribed him various medications and altered his dosages in response to his complaints. The fact that Clayton's medical providers have regularly altered and changed his prescriptions – including Zyprexa, Cymbalta, Zoloft, Prozac, Paxil, Lamictal, Effexor, Celexa, Prazosin, and Depakote – shows they have not persisted in providing treatment they knew to be ineffective. *See Thomas*, 991 F.3d at 772 ("Persisting in treatment known to be ineffective can constitute deliberate indifference, provided that the doctor was subjectively aware that the treatment plan was ineffective."). Thus, because Clayton's medical providers have been proactive in changing and altering his medications in response to his complaints and symptoms, his assertion that the medications have not been effective at

19

treating his homicidal thoughts does not show the treatment he has received is "plainly inappropriate" or violates any standard of care. *See id; Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("[T]he Constitution is not a medical code that mandates specific medical treatment.").

Second, Clayton argues he has missed numerous medical appointments due to his confinement in restrictive housing. While the record does show Clayton has missed medical appointments for various reasons while in restrictive housing, it also shows most of his missed appointments have been rescheduled, he has continued to be regularly seen by MHPs during rounds, and he is currently scheduled to continue receiving both individual and group therapy. These missed appointments have caused some delays in Clayton's medical care, but the record overall shows he has received and continues to receive regular and adequate treatment, and there is no evidence any of these delays have caused his condition to worsen, let alone to the point that he was denied constitutionally adequate treatment. *See Langston v. Peters*, 100 F.3d 1235, 1240-41 (7th Cir. 1996) (agreeing with the Eighth Circuit that "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed"); *Williams v. Liefer,* 491 F.3d 710, 714-15 (7th Cir. 2007) (stating that plaintiff must "offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm"). Thus, there is insufficient evidence in the record by which a reasonable jury could conclude that the fact Clayton

20

has missed some medical appointments while in restrictive housing has caused him to be denied constitutionally adequate medical treatment.

Lastly, Clayton argues he should be transferred immediately to a mental health facility because unnecessarily waiting for his term in restrictive housing to end is limiting the effectiveness of his mental health treatment. As discussed in the court's screening order, Clayton is entitled to constitutionally adequate medical care but is not entitled to dictate how he receives that care, and any injunctive relief would be "limited to requiring that Clayton be provided with constitutionally adequate medical care for his condition." ECF 7 at 5. In any event, the record shows Clayton has received regular mental health treatment in restrictive housing, including being regularly seen and assessed by MHPs and Dr. Rodgers, who opined his mental condition was stable and he should remain in restrictive housing under the "Danger Exception." ECF 94-2 at 1-2. Dr. Rodgers' report was reviewed by IDOC's Executive Director of Behavioral Health, who adopted Dr. Rodgers' recommendation and concluded Clayton should remain in restrictive housing under the "Danger Exception." *Id.* There is no evidence in the record indicating the court should second-guess the decision of Clayton's medical providers and order his immediate release from restrictive housing. *See Bell v. Wolfish,* 441 U.S. 520, 547-48 (1979) (holding that prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," as "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence

21

in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgments in such matters."). Rather, Clayton's belief that he should be released from restrictive housing amounts to a mere disagreement with medical professionals, which is insufficient to show an Eighth Amendment violation. *See Ciarpaglini*, 352 F.3d at 331 (concluding an inmate's complaint that merely disagreed with his doctor's diagnoses and treatment decisions did not state a cognizable Eighth Amendment claim). Because Clayton has received constitutionally adequate care in the restrictive housing unit, he is not entitled to his immediate release.

Accordingly, the court concludes Clayton has not carried his burden for the extraordinary remedy of injunctive relief, as the undisputed facts show he has received and continues to receive constitutionally adequate mental health treatment at MCF, including in the restrictive housing unit. Summary judgment is therefore warranted in favor of the warden.[2]

### *Dr. Ballard*

Clayton is proceeding against Dr. Ballard in her individual capacity for money damages for providing him constitutionally inadequate mental health treatment for his homicidal and suicidal thoughts between March 2022 and the filing of his complaint in October 2024.

---

[2] Because the court concludes Clayton has received constitutionally adequate mental health treatment at MCF, he is not entitled to any injunctive relief in this case. The court does not reach the warden's alternative argument that the injunctive relief requested by Clayton would be against the public interest.

Dr. Ballard argues summary judgment is warranted in her favor because she only saw Clayton on one occasion during the relevant time period and provided him constitutionally adequate medical care on that occasion. ECF 88 at 7-8. She provides an affidavit and Clayton's medical records, which show the following facts: Dr. Ballard began working at MCF on June 3, 2024. ECF 87-1 at 1. At that time, she was a licensed psychologist, but had to practice for a year under the supervision of another licensed psychologist. *Id.* When she began working at MCF in June 2024, her supervising practitioner was Dr. Verdon. *Id.* She became able to practice independently in September 2025. *Id.*

Dr. Ballard had no involvement in Clayton's care prior to her start date at MCF in June 2024. ECF 88 at 2. During the time frame mentioned by Clayton in his complaint, Dr. Ballard saw him on only one occasion. *Id.* Specifically, Dr. Ballard saw Clayton for a therapy session on July 23, 2024. ECF 87-1 at 2-3; ECF 87-3 at 307-09. During this session, she did not observe any symptoms of depression, anxiety, psychosis, or thought disorder. *Id.* Clayton denied any homicidal or suicidal thoughts, ideation, plan, or intent. *Id.* Dr. Ballard noted his speech was clear and his thought process was logical. *Id.* They discussed therapeutic skills to decrease depressive symptoms, including meditation and mindfulness. *Id.* Clayton spoke with Dr. Ballard about his situation, expressed feelings of guilt, and expressed hope for the future and a desire to be a good father. *Id.* He denied any specific mental health concerns or issues, and Dr. Ballard thought his mental status appeared stable. *Id.* Dr. Ballard reminded Clayton to submit a Request for Healthcare form if he needed mental health services

23

prior to his next scheduled appointment. *Id.* Dr. Ballard did not note anything serious about Clayton's mental health status at that time, did not note any signs he was mentally decompensating, and believed the fact he mentioned being hopeful about the future and wanting to be a good father showed forward thought and was inconsistent with any suicidal ideation. *Id.*

About a month later, on August 20, 2024, Clayton reported to a guard that he had thought about stabbing someone and had eaten two pieces of metal. ECF 20-11 at 66-67. Clayton received medical treatment, and the nurses contacted Dr. Verdon, not Dr. Ballard, related to Clayton's claim. ECF 87-2 at 3. Because Clayton was receiving medical treatment and was already scheduled to receive regular mental health care, Dr. Verdon did not believe there was any need for her to take any further action. *Id.* A physician ordered that Clayton receive an x-ray, which found no evidence he swallowed any metal, and when the vent he allegedly swallowed the metal from was inspected, no fragments were missing from the vent. ECF 20-11 at 68-72. There is no evidence Dr. Ballard was involved in or responsible for Clayton's treatment related to this incident.

Over the next few weeks, Clayton received regular mental health services from various MHPs, and his medication was changed by his psychiatrists from Lamictal to Effexor and then to Celexa. ECF 20-3 at 1-7; ECF 87-3 at 310-18, 373, 389-91. Clayton's medical records do not indicate Dr. Ballard was involved in any of this treatment.

On September 28, 2024, Clayton submitted a Request for Healthcare asking to talk to Dr. Ballard. ECF 87-3 at 347. He was scheduled for an appointment with Dr.

Ballard on October 10, 2024. ECF 87-1 at 3; ECF 87-3 at 348. However, for reasons unknown to Dr. Ballard, Clayton did not arrive for this scheduled appointment. *Id.* Clayton then continued to receive regular mental health services by mental health staff. ECF 87-3 at 387-88. Dr. Ballard did not see Clayton on any other occasion before he filed this lawsuit on October 30, 2024. ECF 87-1 at 2-4.[3]

Dr. Ballard argues she provided Clayton with constitutionally adequate mental health treatment on the one occasion she saw him, as she assessed his condition and found his condition was stable, he did not present with any homicidal or suicidal thoughts, and he did not present with any acute mental health issues that required immediate intervention. ECF 88 at 7. In his response, Clayton does not dispute that he only saw and received treatment from Dr. Ballard on one occasion during the relevant time period. Moreover, he does not argue the treatment he received on that occasion was constitutionally inadequate. Rather, Clayton argues Dr. Ballard denied him constitutionally adequate medical treatment for three reasons.

First, Clayton argues he has sent numerous letters to "mental health" saying that he feels like his life is in jeopardy and he wants to kill himself and other people. ECF 97 at 1-2. But Clayton does not explain when he sent these letters, and he does not allege or provide any evidence these letters were sent to or seen by Dr. Ballard. Dr. Ballard provides evidence Clayton submitted only one Request for Healthcare form asking to speak with her before he filed this lawsuit, and in response Clayton was scheduled to

---

[3] Dr. Ballard also provides evidence she saw Clayton for an appointment on November 7, 2024, but this appointment occurred after Clayton filed this lawsuit and is therefore not relevant to his money-damages claim against Dr. Ballard.

see Dr. Ballard but did not appear for the appointment for reasons unknown to Dr. Ballard. This does not show any constitutional violation by Dr. Ballard. *See Wolf-Lillie*, 699 F.2d at 869 (to recover damages under § 1983, the plaintiff must prove the defendant was "personally involved" in a constitutional violation).

Second, Clayton argues Dr. Ballard is the "head provider for this facility" and it is "your job to make sure that everything and everyone got the proper treatment." ECF 97 at 2. There are several issues with this argument. At the outset, there is no evidence Clayton received any improper medical care during the relevant time period between June and October 2024. Rather, the record shows Clayton was regularly seen and assessed by MHPs during this time period and was started on two new medications by his psychiatrists. Moreover, accepting as true that Dr. Ballard is currently the "head provider" for MCF, there is no evidence she held that position during the relevant time period between June and October 2024. Rather, Dr. Ballard attests she began working at MCF in June 2024, had a supervising physician for her first year at MCF, and did not become able to practice independently until September 2025. ECF 87-1 at 1. The record supports this attestation, as when Clayton claimed he swallowed metal in August 2024, medical staff contacted Dr. Verdon and not Dr. Ballard about his claim. Thus, there is no evidence Dr. Ballard was the "head provider" for MCF or was responsible for overseeing Clayton's treatment during the relevant time period between June 2024 and October 2024. And lastly, even if Dr. Ballard was the head provider at MCF during that time period, she can only be held liable for the conduct of her subordinates if she knew of and condoned the conduct. *See Burks*, 555 F.3d at 596; *Chavez*, 251 F.3d at 651. Here,

26

assuming for the sake of argument that MCF's medical staff violated Clayton's constitutional rights between June and October 2024 and Dr. Ballard was the head provider at MCF at that time, the record still contains no evidence that Dr. Ballard knew of and condoned any constitutional violation. Thus, there is no evidence Clayton's constitutional rights were violated between June and October 2024, or that Dr. Ballard was personally responsible for that violation.

And third, Clayton argues Dr. Ballard provided him medications that were supposed to help him make "better choices," but she did not provide him medications to help with his homicidal thoughts. ECF 97 at 2-3. At the outset, Dr. Ballard attests that she does not prescribe medication as a psychologist because that is not within the scope of her licensure, and that medication must be prescribed by either a psychiatrist or a psychiatric nurse practitioner. ECF 87-1 at 2. In any event, there is no evidence Clayton was denied constitutionally adequate medication between June 2024 and October 2024. When Dr. Ballard saw Clayton for the July 23 appointment, he had active prescriptions for both Zoloft and Lamictal. There is no evidence these medications were plainly inappropriate or violated any standard of care. Clayton's psychiatrists then changed his medication from Lamictal to Effexor and then to Celexa (ECF 20-3 at 1-7), and there's no evidence these changes were in any way inappropriate or that Dr. Ballard was personally involved in or responsible for those decisions. Thus, no reasonable jury could conclude that (1) Clayton received constitutionally inadequate medication between June and October 2024, or (2) Dr. Ballard was personally responsible for those decisions.

Accordingly, it is undisputed Dr. Ballard only saw Clayton on one occasion before he filed this lawsuit, and there is no evidence by which a reasonable jury could conclude Dr. Ballard denied Clayton constitutionally adequate medical treatment on that occasion. Aside from that one appointment, there is no evidence Dr. Ballard was otherwise involved in or responsible for Clayton's treatment between June and October 2024, and, regardless, there is no evidence Clayton received any inappropriate treatment during that time period. Because no reasonable jury could conclude Dr. Ballard was personally involved in any constitutional violation between June and October 2024, summary judgment is warranted in favor of Dr. Ballard.

### *Dr. Verdon*

Clayton is proceeding against Dr. Verdon in her individual capacity for money damages for providing him constitutionally inadequate mental health treatment for his homicidal and suicidal thoughts between March 2022 and the filing of his complaint in October 2024. Dr. Verdon argues summary judgment is warranted in her favor because she was not personally involved in Clayton's medical care. ECF 88 at 6-7. Specifically, Dr. Verdon attests to the following facts: Dr. Verdon is the Regional Director of Mental Health for Centurion of Indiana, LLC. ECF 87-2 at 1. In that role, she oversees mental health services provided throughout all of the prisons in Indiana, and does not typically provide any actual clinical services to patients. *Id.* She never provided any clinical mental health services to Clayton. *Id.* Between March 2022 and October 2024, she had no personal involvement with Clayton's mental health care. *Id.* at 3. Rather, Clayton's mental health care was provided by Dr. Rodgers, Dr. Ballard, three psychiatrists, and

28

various MHPs. *Id.* Dr. Verdon was Dr. Ballard's supervisor for the first year of Dr. Ballard's employment with Centurion and sometimes discussed Dr. Ballard's patients with her, but Dr. Verdon does not recall whether they ever discussed Clayton. *Id.* Dr. Verdon's only direct involvement with Clayton was on August 20, 2024, when she received a phone call from nursing staff informing her that Clayton had apparently swallowed a piece of metal. *Id.* at 3. Dr. Verdon confirmed that Clayton was receiving medical treatment from a physician and was receiving regular mental health care, so she did not believe there was any need for her to take any further action after receiving that phone call. *Id.*

Thus, Dr. Verdon has provided evidence she was not personally involved in Clayton's medical care, other than to receive a phone call in August 2024 informing her that Clayton had swallowed a piece of metal. In his response, Clayton does not dispute these facts or mention Dr. Verdon at all, instead arguing only that Dr. Ballard provided him inadequate medical care. *See* ECF 97.

Here, no reasonable jury could conclude Dr. Verdon violated Clayton's Eighth Amendment rights on August 20, 2024, as it is undisputed Dr. Verdon was only informed Clayton had swallowed metal and she knew he was actively receiving treatment from a physician and was receiving regular mental health treatment. There's no evidence Dr. Verdon's decision not to take any further action at that time was "plainly inappropriate" or violated any standard of care. Moreover, no reasonable jury could conclude Dr. Verdon violated Clayton's Eighth Amendment rights due to the fact she was Dr. Ballard's supervisor, as there is no evidence Dr. Ballard violated Clayton's

29

constitutional rights during the relevant time period, as discussed above. *See also Burks*, 555 F.3d at 596; *Chavez*, 251 F.3d at 651. Therefore, no reasonable jury could conclude Dr. Verdon was personally responsible for violating Clayton's Eighth Amendment rights. Summary judgment is thus warranted in favor of Dr. Verdon.

For these reasons, the court:

(1) GRANTS the warden's motion for summary judgment (ECF 74);

(2) GRANTS Dr. Ballard and Dr. Verdon's motion for summary judgment (ECF 86);

(3) DENIES Clayton's motion to renew injunction (ECF 90); and

(4) DIRECTS the clerk to enter judgment in favor of the defendants and against David Clayton and to close this case.

SO ORDERED on April 15, 2026

/s/ JON E. DEGUILIO
JUDGE
UNITED STATES DISTRICT COURT

30